So we'll call case number 22-1223, Trey Johnson v. Albee v. NCAA. Counsel? God bless the Honorable Court. And Counsel. Thank you. Thank you. Since your Honor's not going to bother issuing a focus letter, I suppose I'd better come straight to it. As the question of focus letter would suggest, the kinds of changes in the law suggested by the arguments advanced by the students in this case creates a minefield of unforeseen consequences. But there are some consequences that can be reasonably foreseen now and ought to be outlined. And in particular, when it comes to Title VII and Title IX, the potential for the adoption of Plaintiff's Rationale and therefore leading to a conclusion ultimately that student-athletes or employees under the FLSA would create a terrible double bind for universities caught between inconsistent Title VII and Title IX standards with regard to certain claims. I want to be clear here. Insofar as both statutes address employment discrimination, there's not a lot of tension between Title VII and Title IX. So much so that this circuit has held effectively that a plaintiff alleging employment discrimination within the context of education has an election of remedies. They can pick between Title VII and Title IX. One does not displace the other. But Title IX reaches more than just discrimination in employment. Title IX reaches affording equal opportunity to participate in athletics for men and women. And with regard to the regulations under that prong, there's a potential clash between Title VII and Title IX. That bind that universities may find themselves in between VII and IX with regard to equal employment opportunity has the potential of falling disproportionately on female shoulders because it might ultimately undo advances that Title IX has wrought for female athletes. Thinking back to the fiasco that occurred during the Olympics where the women's weight room was basically a closet with a couple of dumbbells tossed in it and the men's weight room and the men's exercise room looked like a spa in the Four Seasons. And you already have that. That's not to minimize it or say it's right. But I'm not sure those kinds of problems which are clearly there and if the athletes win, if the other side wins, it would clearly create some real issues. That doesn't mean they're wrong. It just means that built into what we have today in this modern universe of a billion-dollar college sports activity, there are some real problems, most of them I think are policy problems, that are going to have to get worked out. And the NCAA may be able to do that through its incredible control. I just don't know. All I'm saying is what's legal and what's practical here seem to diverge, may not be the same thing. And I agree with your honor certainly with regard to your point making about there being policy problems. I'd like you to put a pin on that point. I'll come to it at a later point. But I want to come more directly to the thrust of your question. Let me give you a practical example and one that is more serious than whether the weight rooms are nicer or worse depending on which gender gets to go into the weight room. A concrete problem. Title IX requires athletic expenditures in proportion to the populations of men and women in the relevant schools. Virtually all universities, women outnumber men. And Title IX regulations, as they should be, recognize and tolerate, make room for the fact that there is sex segregation in teams. You can't always have men and women on the same teams. Some sports draw a very disproportionate amount of interest in one gender than the other. As a result of these two things, you will commonly find that scholarships are divided between teams where there are men and women. There are more scholarships for women than men. Very, very common across sports. That is a natural result of the Title IX regulations consistent with Title IX. The expected result, the purpose of that portion of Title IX, to create expanded opportunities for women to participate in athletics. Very difficult to see how that can be reconciled with Title VII principles because those disparities in scholarships, and this is one concrete example, Judge McKee, to give you something tangible to look at here. Those disparities are not necessarily the result of a history of intentional discrimination in the past. They may not pass Monster as remedial. They may not pass Monster as remedial based on intentional discrimination. And as a result, there may be a real Title VII problem there. There may be ways around it. Judge McKee, I think that your dissent and attachment case points to a way where those principles could be reconciled. But respectfully, that was a dissent. It's not law of the circuit. I read a lot of them. I'm sorry. Let's go back to the issue of pay. All right? Yes. So you would agree that the athletes at the service academies are NCAA athletes, right? Yes. They're paid, aren't they? In service academies? Yes. Students are paid to be there. Students are paid but not to play. But they're paid. So the football player is paid by the academy and the NCAA is okay with that? Just as the non-football player is paid. All right. But the football player is paid. And there's nobody from the NCAA saying those folks aren't amateurs? Correct. In the same way that student athletes may very well hold other jobs on campus and get paid for them because they're indisputably doing work. That is employment under the NCAA. In fact, on the NCAA restrictions, there's a real problem with, say, the quarterback for the football team in Alabama working in the cafeteria dishing out food. Isn't there a problem with that? Maybe I'm wrong, but I thought there was a restriction on what student athletes could do to earn money. By the way, Your Honors, I intended to reserve five minutes for a battle. I hope I mentioned it. You got it. Okay. Okay. It is potentially a problem, at least in the past, it is potentially a problem if that quarterback is getting paid ridiculous amounts. Getting paid disproportionately. We're getting paid ridiculous amounts. Well, it depends on the fact. They can sign an NIL bill for the ridiculous amount. But NIL money does not come from schools. I get it, but it's a different bucket of money. Right? Well, but it's more than a different bucket of money. It's a different source of money. If a student athlete is independently wealthy because they have a trust fund, no one suggests that that trust fund somehow would endanger their status as a nonprofessional. The trust fund would make them an employee. How are they not employees of the university given the requirements and the regime they have to adhere to, the D1 athletes? For the same reason that the students of the university are not employees. The very point made by the Supreme Court is that the trustee always gets. Under all the tests, looking primarily at the economic benefit test, if we focus on the extent to which the enterprise, here let's look at the university and the NCAA and their alleged joint employers, the extent to which the efforts, the work, the labor, if you will, the talent of the athletes, contributes to the economic business, to the success of the enterprise, is vastly different than the work-study student in the cafeteria in the library. It's totally different. Your Honor, may I ask, and I don't mean this in a foolish way, may I ask why? If your point is simply because there's more money in the state. No one has a billion-dollar contract that televised folks going to the library to read some books to get ready for the midterms. Okay. Your Honor has a point, but it also touches on an important principle here. Because the plaintiffs want you to watch the money. So listen to them. This is about not just men's football and men's basketball, but men's football and basketball at those two schools that make substantial amounts of money off of the broadcast rights. But that's not the complaint here. That's a different case. It's not before your honors. What's before your honors is every sport. Every sport. And the control, really. There's a lot of reference in the complaint to the control that the NCAA and the universities have over the student-athlete that students are not subjected to. A student-athlete can't bet, has restrictions. A lot of restrictions that the student working in the dining hall is not subjected to. So it's a control issue, too, right? Well, to some degree. And betting is a good example. I'm not sure how many other good examples there are of control that's different for a student-athlete than anyone else. I mean, do you understand? According to the complaint, what about the restrictions with respect to class schedules and the unavailability of certain electives that will conflict with their practice times and that the practice time supersedes any responsibility they have with respect to their class schedules? Those restrictions, to the extent they actually exist, and I realize we're on a 12B6 motion. So they exist. And have existed for decades upon decades. And no court has ever thought that they presented a problem. No court has ever suggested that student-athletes are ipso facto employees. Those restrictions existed when the Department of Labor wrote the field operations handbook and wrote in a specific provision that student-athletes are not employees in a natural sector. Can we consider that right now? Can we consider the DOO? Of course you can. You know that exists. You know that all the elements of a Section 259 defense are presented by way of judicial notice. Well, reliance is not presented here. We don't know if it's been done. Oh, but, Your Honor, it is. You can take judicial notice of briefs that have been filed in prior litigation before the limitations period on this claim. You're saying that there is judicial notice of the fact that the NCAA and the universities relied upon the Department of Labor for guidance in determining whether or not to employ them? Your Honor, as laid out in the brief, outside of the limitations period on this claim, giving claimants the benefit of the extra year for willful violation, there are briefs that you can pull off of PACER showing every one of the NCAA and every one of the schools that are before you today stating their reliance on that provision. In briefs filed in front of other circuits, you can get them right off of PACER. They're all cited in the record and in our brief. I know this is going on. We can take reliance on what's in a brief, which is an adversarial piece. I just don't know the answer to that. But go ahead. I don't want to pull you off track here. Okay. Well, Your Honor, didn't pull me off track. At this point, it looks like I've got about 20 seconds. Go ahead. We'll give you some time. Well, Your Honor, I wanted to make two overarching points without sort of belaboring the brief. One, I think I've already made. This is not a case about football and basketball, particularly men's football and basketball. This is about every sport. And the principles that resolve this case have to apply to every sport, fencing and volleyball and track and everything else. If our touchstone for the analysis is economic reality, how do the economic realities across the board, all the sports, all the D1 universities, how does that play into how we should come out? Well, fundamentally, the test of employment, I'll tell you, is a test of economic reality. So if the economic reality shows one thing for Power Five men's football and March Madness men's basketball and a different economic reality for the whole rest of the universe, how should we deal with that? I'm not sure that's correct, Your Honor, because I think you're misconstruing economic reality. But set that point aside. That's not the case here. I'm misconstruing it too. I have the same question. That's not the case here. This is not a case that distinguishes Power Five basketball from other sports. Okay, but go with the hypothetical, because both two of us want to hear the answer to that question. Okay. The chef doesn't care. Economic reality is not simply a matter of whether the activity generates money, because a very short, slippery slope from that idea to the idea that employment status somehow turns on profitability, which turns a whole bunch of laws on their head, including bankruptcy laws on their head. Employment status is not a function simply of the amount. It's not a function simply of the benefit that might be derived, because... But isn't it a part of economic reality? And every court has looked at this. They define it differently. But every court has looked at this to some extent relies upon economic reality. True. Absolutely true. Here's what I'm getting at. If we're talking about a market, there is a market for certain student athletes' skills and work, and you can define that by TV revenues and gate receipts and NIL deals. You don't have that kind of economic activity for the other kinds of sports and at different D1 universities. How does that affect the analysis of whether there's even a market for student athlete labor? Yeah. Your Honor, I'm not sure the ultimate answer to that. Again, I do want to point out that is not this case. That might be the next case coming up. I understand, yeah. And when you begin talking in those terms... I'm actually inviting you to make the distinction between this case and that other case. Well, I'm not sure how to make the decision. But whatever that case might lead to, it doesn't lead to an affirmance in this case. I would also suggest that when you're talking about market, you're beginning to incorporate economic notions out of the amitrust arena, which may not be properly applied here because in economic terms, there's a market for everything. I mean, the famous research at the University of Chicago, you can talk about the market for babies. You can talk about the market for you and organs. So the notion of market in an economist, in an amitrust sense, is Alaska in a way that's not helpful here. But true, the testimony is economic reality. That reality is centered around the notion of a compensation margin, as outlined in the briefs. There's arguably a market for world-class musicians. They get scholarships. For people with perfect SAP scores and 4.0 grade point averages, they get scholarships. It's kind of a compensation bargain. How are those people different than the student-athlete, than the market for student-athletes? In the sense we're talking about today, they're not different. If the plaintiff's analysis is correct, then where does it end? I was one of those students with a 4.0 and your perfect SAP grades. I wasn't. Was I an employee? Not even close. But the question then is, those students that have the 4.0s, the violinist, or the folks in the choir, they don't have the same restrictions. They can hire an agent, can't they? They can hire an agent to represent them, right? Sure. An athlete can't, right? Because the NCAA says they can't. They can take the courses they want to take, when they want to take them, when they're offered. A 4.0 kid can set up a little betting pool in his dorm, right? Depends on the state, Your Honor. I grew up in Las Vegas, yeah, but I went to school in L.A., no. In Vegas. The kid can set up this 4.0 kid. He can set up a betting pool, but the quarterback for the running Rebels can't, right? Well, presumably the kid could, but whether there are collateral consequences to that, I don't know. You were about to launch into a point about compensation bargains, so I'd like you to say your piece about that, but then tie it into Tony and Susan Alamo. Okay. Well, the notion of a compensation bargain runs through the definition of employment, runs through the economic reality test. It's inherent in the very language used in the NFL, as demonstrated in the brief. The Supreme Court touched upon it as early as the Tennessee Cole case, and the compensation bargain is still there and affirmed in the Alamo case. Now, Alamo said the compensation bargain isn't necessarily an expression applied bargain for money, but there's a compensation bargain, which makes perfect sense, because the FLSA is very clear that the provision of in-kind benefits to employees is wages, even though it's not in the form of cash. Go ahead. Why isn't there a form of compensation bargain right now, given the grants in aid and the other monies and benefits that the student-athletes currently get? The answer to that in terms of the Supreme Court is in Alamo, where the court specifically said as to whether or not these folks were volunteers or employees. They said, according to this, volunteers expected to receive in-kind and non-cash benefits in exchange for the services, which amounted to, quote, wages in another form. Why isn't the benefits they receive in – when you get to non-scholarship work grants, it's different. We can hopefully have some time to explore that. But in terms of the room and board, tuition, whatever other package is part of the talented athlete in a revenue-producing sport who gets a scholarship, why isn't that, especially under the rubric of Alamo, why aren't those wages? Because that conclusion, again, launches you over the edge of a slippery slope, which perhaps takes you to someplace that you don't want to be. You don't want to be there, but we're trying to figure out if we should be there. Well, I'm suggesting you should – I am urging you not to want to be there. Fair enough. The overwhelming majority of student-athletes do not receive scholarships. They simply play. And if you accept, for the sake of argument, the proposition that somehow – But isn't that true in Division I schools? I'm sorry? That's true in Division I – It's true in Division I schools. We consider all sports are – and, again, this is not just about football. But those folks still have to adhere to all these rules the NCAA puts on them, right? Regardless of whether they get a scholarship. That is true. But the end result of that is – that analysis is that some small portion of student-athletes are employees, and the athletes next to them are not. But what's wrong with that? That may be what it is. I don't know. But there's so many practical problems endemic in this dispute in Division IV. Maybe that's where we end up, that the quarterback at the SEC school is an employee, and the woman who's running cross-country track at Alabama LSU, they're not employees. Maybe that is where you end up. This is the only influence I have over that. Then it becomes up to you, of course. But this raises sort of a second point I wanted to get to and haven't been able to get to yet, which is, as you point out, there are so many practical consequences and problems here. This is fundamentally a case premised on policy propositions, not law. And Judge McKee, I would point out, as you said in your dissent in the Curitin case, ultimately you function as a court of law, obviously not a law legislature, particularly coming at a time when there is so much formant in this field. These are problems to be considered by a legislature, which is better disposed to work through, arguably better disposed to work through the consequences. In theory, it is. That's all I'm saying. What's the slippery slope? If we find that the current state of affairs amounts to a sort of compensation bargain, that turns the student-athletes into employees. What's the slippery slope that we need? No, no, no. The slippery slope I was last referencing is the notion that the scholarship somehow constitutes a compensation bargain, which means scholarship students, employees. Well, what about the other five or six or eight or nine student-athletes on the same team next to them who don't get scholarships? I understand. They're not employees? Well, but the test, if compensation is simply one part of the test, whether it's a glad test or whatever test we look at to get to economic reality, it may be that other factors apply to them, like control that we've talked about, those kinds of things. The extent to which being an athlete forces you, at least according to the complaint, to perhaps compromise your entire educational path, your major, and all those things. It may be that they're an employee not because of the compensation in part, but because of the other things that go into whatever test is applied here. I just don't know. I don't either. Should we apply GLAD? And if not, what test? You should not apply any multi-factor test, because all of them are multi-factor tests. They're a thumb on the scale. They're all intended. Let's say I agree with you that none of the existing multi-factor tests work. Now what do we do? I think you should resolve it in the same way the Seventh Circuit resolved it in Berger. What if we—go ahead. I can elaborate, but I'm sure you're— Basically, they're amateurs because you call them amateurs. No, it's not because they call them amateurs. It's because they play with no expectation of compensation. It's not just the label. It's not— What do you make of Judge Hamilton's concurring opinion? I'm sorry? Judge Hamilton wrote a concurring opinion, right? Yes. He said that that analysis in Berger might not be applicable to the D1 athletes. He did, but again, that's not this case. That is this case. These are D1 athletes. No, he wasn't talking about all D1 athletes. I believe his concurrence was talking about D1 athletes in the, quote-unquote, revenue sports. That's what he was saying. He was saying that if we had a situation of a revenue-producing sport, as opposed to, I think, what's in Berger's track, that he's not at all sure that the case would come out the same way. In fact, Berger was before Alston. All the cases are before Alston. And I'm just not sure that Berger helps you that much because I agree with Judge Chappell. So, in Berger, they seem to be saying, well, they're not employees because they're not paid. And they don't have any expectation of being paid. Therefore, they're not employees. Yes. Exactly. It's not the label amateur. It's not because you've been called amateur from on high and this label decides everything. It's the fact that you play without an expectation of pay, which makes you an amateur. And it's the fact that you play without an expectation of pay that makes you not an employee in the FLSA. That works in the free market context. I'm sorry. That works in the free market context. We're not in the free market universe here. We've got a situation where, because of the tradition of the NCAA not paying, there is no expectation of paying because of the NCAA rules. So it doesn't help, at least to me, to say, well, there's no expectation of payment. Yes, there's no expectation of payment because we're not in a free market universe. We're in a universe where, by definition, if you come in and make us a billion dollars plus, you're not going to get paid. Period. End of story. We're also going to tell you what courses you may not be able to take because it might conflict with your regimented schedule, the timesheets they have to fill out, which I wasn't even aware of, or at least wasn't going to complain. It sure looks like the kind of control that, if we're looking at economic reality, would lead one to conclude that employees, I agree, there are all kinds of problems that come out of that. And you can argue, well, that's the job of the legislature and not the courts. And that may be, but that doesn't help with answering the legal question. We can answer the legal question and say there are policy problems here that we can't resolve. But I'm hard put, at least in terms of all of the cases, even the ones that you support, to defend yourself, to defend your position. I don't know how these folks are not employees. I don't know what road I can go down to conclude, speaking only for myself, that these folks are not employees, given the control, given the economic reality of the relationship, which seems to me to be the hundred pound elephant on the scale of employee. I don't know how you get out of that. Did you represent that over half of the D1 student athletes don't have a scholarship? Yes, I believe it's more than half. So they wouldn't have a compensation, an expectation of compensation, because they're just playing because they want to play, I guess. They don't have a scholarship. For the same reason that student athletes at the high school level don't have an expectation of compensation. No one would even suggest that they should be classified as employees, let alone deal with the child labor implications. I missed the Rose Bowl, Binghamton High versus Alleganquin High. It wasn't on my calendar. So you're not saying that because someone is an amateur, their FLSA can't apply to them because they're an amateur? No, I'm saying they're an amateur for the same reason that the FLSA doesn't apply to them, because they're not professional athletes. They play without an expectation of compensation. That's what you have to do to play college sports. You don't have to play college sports. You can go to college without playing sports. What if they would like to have an expectation of compensation, but the universities agree not to offer one to them? But there's nothing nefarious about that, and certainly there's no antitrust claim here, and we're going to talk about antitrust in a different debate, and it seems to me that Alston made it clear they're not going down it. It's universities. No economic actor is obliged to say, I'll agree to pay you if you do something for me. Somebody comes to me and says, I want to wash your car. Okay, I'm not going to pay for that. I don't want you to do that. If you do it, okay, don't scratch it, but I'm not going to pay for that. No one would suggest that you've tolerated them washing your car. Now, at some point in those facts, if it happens every day for a while, it might be different. What about the scholarship and the athletes that aren't on scholarship? Is that compensation? I don't think so, but again, a different debate and one that we haven't briefed. What is it? Is that compensation? What is it? Prize money? It's a scholarship. It's what a scholarship is. Which has a monetary value. Which has a monetary value. Why are they getting the scholarship? They're getting the scholarship because they're playing. They're getting the scholarship to enable them to attend college free of economic pressures so they can play sports. And what happens if they stop playing sports? I'm sorry? What happens if someone voluntarily stops playing a sport because they're on scholarship? I'm assuming the scholarship goes out the window. Your Honor, can I submit a letter brief on that point? I'm not sure if the regs have changed, but certainly in the past it used to be certain kinds of scholarships. You keep the scholarship even if you stop playing. Well, there are other scholarships. The coach has to renew it every year, right? Yes. So that means this coach has complete control over this young person. Your Honor, here I would have to ask for an opportunity to submit a letter brief because I've not studied up on those portions of the bylaws well enough to give you the proper representations, and I don't want them to state the case. Okay. I thought it was going to be a complaint also, but a letter brief would be fine. Right. What happens to someone if they quit or they get kicked off their team? Do they keep their scholarship for that year or for future years? I thought that's what you were going to put in the letter. My understanding is, depending on the circumstances in which they're kicked off, they can keep their scholarship. But, again, I want to emphasize I have not looked at those bylaws in preparation for this argument, and I don't want to misstate them. Wasn't there a case where the soccer player made an obscene gesture to the camera, and so she was kicked off her team, but she kept her scholarship? The court said she still got to keep her scholarship even though she was kicked off her team for cause, basically. I don't want to call that a case. Okay. I simply don't want to misstate. Yeah. Thanks. We'll see how we go. Thank you. Good afternoon, Your Honors. May it please the Court, my name is Michael Willeman. I'm a partner with the law firm of Weed Door LLP, and we're one of the two firms that represent the plaintiffs in this case. I'm going to jump around a bit just in kind of response to some of the things. Let me start with this. Did the district court apply the right test? We believe that the district court applied the correct test because it's as of all the existing tests. So, if you were writing the test, how would you write it? It would be the GLAD test. I mean, the fact that there are, even under the GLAD test, there are the abilities to add factors in specific circumstances that may be relevant that aren't articulated in those seven factors. So, there's an opening for that. But the GLAD test has been recognized by circuit courts across the country as the most appropriate test. Because they didn't know what else to work with. I'm sorry? Because they didn't know what else to work with, and it was there, and they kind of picked it up and ran with it. It seems to me that at least two of the factors, I know the first and the sixth and the seventh, I'll find it, seem to factor in the same kind of circularity that you're accusing your opponent of relying upon in his argument. Well, the first factor, and I'd like to discuss that because we just had a lot of discussion about the compensation bargain and how that might impact someone's entitlement to minimum wage under the FLSA. And that factor, it's an important factor. It's one of the seven that are considered. But it is one of seven that are considered in the GLAD test. It is not the only factor, nor is it a dispositive factor. And you cannot, I think… Is there any one factor that's more important than the other factors? No court has held that any particular factor should be given any specific amount of weight versus the other factors. The decisions that I'm familiar with, including the GLAD decision itself, it is a holistic approach. And the reason for that is because although those are specific factors that the GLAD test wants to look at, the idea is to get to the economic reality of the relationship, right? And so… But again, that would work in a free market enterprise. We're not talking about that here. And that's why I said that it's the seventh factor. The extent to which the student and the employer understand the assignment is conducted without entitlement to a paid job, that circular, as is the first factor. The extent to which the student and the employer clearly understand there's no expectation of compensation. To me, that's the same thing. Well, I agree with that. And I think, frankly, that those are, despite some of the jurisprudence, particularly in this case, are perhaps the two least important factors. And the reason for that is that the Supreme Court has repeatedly held that you cannot waive your right to the minimum wage under the Fair Labor Standards Act. You can look at the cases and try to point out specific facts that discuss compensation bargains. Well, but the fact that you are not operating under a compensation bargain cannot be dispositive, given the language of the Supreme Court cases. And so, essentially, if you look at the first and seventh factor, and you determine that those two collectively are dispositive, which is essentially what the defendants would have this court do in this case, then you would not need the other five factors. Any employer at any time could say, we're not going to pay you, and we're not going to give you a job when this whole thing's over. Whether or not those things are reasonable or not reasonable, and then that would vitiate the need for the other five factors that exist in the GLAD test. And that's not the law. I mean, Tony and Susan Alamo found, excuse me, fund. In that case, as your honors know, the purported plaintiffs protested coverage under the FLSA and said that they did not have any expectation of any sort of compensation or salary. And the court held specifically that if an exception to the FLSA were carved out for employees willing to testify that they performed work voluntarily, employers might be able to use superior bargaining power to coerce employees to make such assertions or to waive their protections under the act. And the Supreme Court said they can't do that. And the Supreme Court has repeatedly stated that, again, in the Tennessee Cole case, where the Supreme Court said that it was immaterial, whether there was a prior custom or a contract, not to consider certain work as compensable. But not everyone who does activity that looks like some kind of work is, therefore, an employee, right? Of course. And that's one of the big red herrings, frankly, that we're, I think, seeing from the defendants, is that there is no – this is not a slippery slope. This is a very specific case that involves student athletes who dedicate a tremendous amount of their time and are completely controlled to the detriment, the serious detriment, of their academic development. Is there a distinction, from your perspective, between the scholarship athlete and the walk-on and the athlete that plays for a revenue-generating sport and a non-revenue-generating sport? No. I'm going to answer that in two ways. One, no, because as Mr. Katz just conceded in his oral argument here, employment status is not based on profitability. That's just pure and simple. If these individuals – Profitability of what? Because your whole argument – not your whole argument – a big chunk of it is the profitability of the NCAA made possible by, and only by, the activity of the athletes. That – see, the thing is, I wouldn't characterize that as a big chunk of the argument, because at the end of the day, again, there are various factors that are considered. And the benefit – What if they made no money? Let's assume we live in a fantasy world where Roosevelt was on – maybe on local television. Nobody watched it. Nobody watched any – March Madness was called March Waste of Time. Or I think it is anyhow. And there was absolutely no revenue generated by the SEC or the Big Ten. How many schools in the Big Ten are there? Big 20, whatever it's called. No money coming in. You're saying that your argument would be the same? We believe that the five factors of the GLAT test that sit between one and seven are enough to carry the day in this case for scholarship athletes, for non-scholarship athletes, for revenue and non-revenue generating sports. But to answer your question that I believe we didn't get an answer to when Mr. Katz was up here, is that all of those issues can only be decided after discovery. Because – and I want to reflect as to where we're at on this – in this case. We didn't plead that none of these other sports make money. We didn't plead that only X amount of people are on scholarships. We didn't plead that there will be a parade of horribles if this case ends up prevailing. None of those are in the pleadings. Those are complete straw man arguments. Straw man for the purposes of where we're at from a procedural perspective, but also straw man for another reason. No one is forcing the NCAA to exert the degree of control it exerts over its student athletes. If they lose this case tomorrow, they could change the rules to make the GLAT test turn out in their favor in a pretty simple way, particularly given, of course, our concession and belief that neither a compensation bargain nor revenues being generated are dispositive of the issue of whether someone's employed under the FLSA. What about – I think I forget the question. What about – this is not this case, I know it, so please don't answer the question by saying it's not this case. Hypothetical. What about Division III? If you're saying that the economic success of the enterprise has no bearing – and maybe I'm overstating your position – has no bearing on the employee status. I thought that's what I heard you say. And that's why I went off on my rant about high school Rose Bowls. What about the Division III athlete? Would they be – everything else is saying take the money out of the equation. Would they be employees? Well, it's not the same. So I'm not a Division III expert, but the amount of control – I do know that the amount of control that's exerted over Division III athletes is nowhere near the degree that is exerted over Division I athletes. Here's a better comparison of Division II. As you look at the MCA regulations, the Division II requirements are pretty close to what they are for Division I. That's true. And, again, I think that that would be another issue that you'd have to deal with after discovery. Why are we here then? If it's also fact-intensive and requires discovery and everything, the purpose of a 1292B appeal is to facilitate swift resolution of a controlling, pure, legal question not to offer advisory opinions rendered on hypotheses that evaporate or may evaporate in the light of full factual development. Yeah, we opposed – I mean, respectfully, we opposed at the district court level the interlocutory appeal request. It was not on consent. And at the circuit court level, well, we also opposed – we also, I think, in our brief wrote that there was no need for this interlocutory appeal because it can't resolve these issues. The only issue that's properly in front of this court, respectfully, the only issue is whether or not the NCAA is above the law. And by that I mean whether or not the NCAA can simply get out of this case. No, no, no. You keep saying that in your brief. I don't think their position is we're above the law. I think it is the law doesn't apply to what we are the way it does. For example, one problem I have with GLAT is that it assumes from the outset that the individual is a worker who works, and the institution that he does work for is an employer. I'm not sure that fits here because these student athletes might be playing, not working. Well, play and work I don't think in any way, shape, or form are mutually exclusive. I mean, you have – there's no question, and the district court pointed this out in its opinion, there's no question that play can be considered work to the extent – The position is that play is the job. It is the job. That's the job. It can be. It cannot be, too. I mean, my kids play high school lacrosse. They play. Yeah, I understood. But then, of course, there are all the restrictions that are placed on the kids that play at the one level in college. And that's another one of these straw man arguments. So now the band is going to be considered an employee and so on and so forth. But with respect to your particular point, the institutions are employers. There's no question about that. They have tons of employees. And just like in the Glatt case, there is an employer. Glatt does not assume that the intern is an employee. There is a company that employs people, and Glatt says, here's a subset of people. We've got to figure out whether these people are employees. Here's how we're going to figure that out. Now, it may not be, at the end of the day, the most perfect test for this, and if you look at the decision of the district court in Pennsylvania that decided a predecessor case to this LIBORS, that court ultimately held on a motion to dismiss that it would not determine whether or not a multi-factor test or what multi-factor test should apply at that stage. But the fact that you point to amateurism, and this is maybe where you take issue with me saying that they're above the law, but the idea is they're asking for a different application of the law than would be what is done with virtually any other company in the country. And they did the exact same thing in Alston. And I think that that's a really – I just want to talk about that decision for a moment, even though I'm sure you're obviously very, very well versed in it. They made the exact same argument in Alston. They had a rule of reason, which is the ordinary scrutiny that the antitrust laws provide under circumstances like this. And the NCAA said – and this is how Judge Gorsuch framed it – in essence, the NCAA seeks immunity from the normal operation of the antitrust laws because they asked for an abbreviated deferential review. And the reason they asked for an abbreviated deferential review is because of the language of Board of Regents that the NCAA claims gives them some degree of immunity towards the regular application of the law. So you can call it being above the law or you can call it however you want to name it, but they want a different law to apply to them, a different process. And the court in Alston said, no, that's not what Board of Regents says. That's not what Board of Regents mandates. We're going to apply the rule of reason because that's what we do in these cases. And the exact same argument is being made in this case with even less justification because this is not an issue of pro-competitive, anti-competitive. There's not that tension here. The issue is whether or not there's a significant degree of control over these student athletes to make them employees, and that involves consideration of various factors, of course. The FLSA was enacted in 1938. Were student athletes employees in 1938? Depends on who you ask. I'm asking you. Yeah. And if they weren't, at what point did they become? No, they were more so employees in 1938 than they are now because, and I don't have the whole history that Alston decision laid out of the shifting and the changing. Yeah, I remember it. But as farther back you go in time to a degree, there is a better argument that people were employees. And actually, this goes to the… Okay, so in constitutional law, we talk about the concept of liquidation. If the constitutional provision was unclear at the outset, over the next however many number of years, it was sort of made clear through practical application. So if this was at all unclear in 1938, why does the fact that these student athletes were never brought actions under Title VII, they were never considered employees by anyone until potentially recently, 85 years of that sort of liquidated practice, why should we change it now? Well, and let me be clear on why I mentioned that they were perhaps more so employees back then, is that they received under the table in some circumstances, right, but they received benefits and compensation. So if the NCAA is saying that the compensation bargain is somehow dispositive, I think you would have to say that that would make these individuals more so employees. What makes it different now is a couple of things. One, after the passage of the sanity codes and the NCAA actually existing and coming together and saying, here's all the rules, and they get tighter and tighter and tighter every year with respect to things that help us in terms of the control that they have over students, and get looser and looser and looser with the things that hurt them in terms of the types of benefits that they allow students to get. And I won't get started on the NIL, but to suggest that the schools are not involved in NIL is completely preposterous. And you could read an article about that every day, all day. That issue isn't in the record. We didn't plead it, but that's not a reasonable argument to make, I don't think. But the point is that, A, there's been a lot of changes. B, as Austin said, even in the last 20 or 30 years since the Board of Regents case was decided, one of the factors, not the dispositive one, but one of the factors is the economics of college athletics, which has changed drastically and could potentially change, again, the ultimate balance of where this issue goes. And there just has not been the challenges under the FLSA except for the Berger case, which we contend was wrongly decided because it relied not only on Board of Regents but also on the Van Stuyke case, which is just not comparable. It's ridiculous. It's not comparable, and it's an offensive comparison, to say the least. And the Dawson case, which was basically just said Berger was decided, so we're going to decide it this way. And now there's two more cases. And all these cases have happened relatively recently where challenges hadn't been brought under the FLSA. And the last two cases that they've been brought were livers, where we got past the motion to dismiss, and then this case, where we're now at least sort of past the motion to dismiss, at least in the first instance. And there's oftentimes societal recognition and understanding that just because things have been away for a long time doesn't mean that they're right. And these legal challenges are valid legal challenges. And whether the NCAA wins or whether the NCAA loses, that's not being decided here in this courtroom today. What's being decided in this courtroom is whether this complaint states enough facts that could lead someone to come to the conclusion after discovery that our clients are employees of the institutions for which they work. Let me go back to the early question, and I'm glad. If you're writing the test, what factors would you make into the equation? Control, I think. I mean, this is personal, me personally. Yeah, this is you. I'm asking you. I think control is by far the most important factor. What else? It's related, but the interference with which the collegiate athletics has on someone's academic ability to pursue their academic pursuits. Because the whole reason they're ostensibly in these universities is to get an education. And so if that is commandeered by the NCAA, and they say, we're going to control you in terms of basically everything you do. And gambling is not as far from the best or the only, sorry, excuse me. They lost their freedom of speech. They can't disparage other schools. They have the class scheduling issues that your honor mentioned. Majors that can't even be pursued, particularly those in the sciences. They can be fired by their teams. I mean, that's an employment relationship. And when this case was filed, I think it's since changed, but when this case was filed, they literally had, and this is in the complaint, they literally had a non-compete that was in place if someone wanted to change schools from one to the other. If a coach cuts an athlete during a given season and then their employee, now that decision becomes a dispute over a term and condition of employment, and there's maybe a Title VII claim because he's been cut from the team, he's been fired. So I'll speak briefly to the Title VII, Title IX issue. This case, there's nothing that's going to happen in this case that's going to change any obligations that any institution has under Title IX or Title VII. And the reason for that is all we're seeking in this case is the minimum wage. Okay, but doesn't the coach now in the back of his mind have to think, if I cut that kid, I'm going to run into a Title VII claim? So, no, I mean, that could happen at some point in time. But if we prevail in this case, the only thing that's going to come out of this case is that student-athletes are employees under the FFSA. Whether they're employees under the NLRA, whether they're employees under Title VII, whether they're employees under various other statutes is not going to be decided. I think the course is pretty uniformly said, employee under FFSA means employee under Title VII. I understand, but two things. One, and I'm not dodging the question at all, this is not this case, right? We cannot make, I would submit that a court could not possibly at the pleading stage make a determination that this case needs to be dismissed because at some point, if we prevail in the case, then they might have Title VII obligations. But more importantly, two things. If we prevail in this case, then they should have Title VII obligations. If their student-athletes are employees because of the way that they treat them, they should have coverage under the other statutes that protect employees. But again, they are not forced to treat these kids as employees. They can relax the restrictions. In your brief, you said that an NCAA could change its rules so that athletes would no longer qualify as employees. What are some examples of some rule changes that you're referring to? If a student has to miss a part of practice because they want to take an elective class so that they can have the major that they want to major in, that student can miss that part of practice and not get fired or suspended or cut from the team. And that's one very obvious one. But you seem to be consistent with the concept of student-athlete anyway. You would hope so. You would hope so because the NCAA has turned the idea of a student-athlete on its head. That's not what these kids, even the ones that are in non-revenue generating sports, even the ones that are lesser, I guess, prestige. The regulations apply across the board, as Mr. Katz conceded. These are regulations that the NCAA can change. They've chosen not to change them, probably A, for their own economic self-interest, because even, and again, this is something that's going to have to be done in discovery, but even if only a few schools or only a few programs, et cetera, are revenue generating, they still have all these other sports. So basically what they're trying to claim is that it's going to be the difference, whatever the minimum wage is at a given state, that that's going to be what makes them decide to kill all these sports. They have those sports because the law requires them to. Title IX, for example, requires them to. Well, it doesn't require them to have specific sports. It doesn't require them to have non-revenue generating sports. All it requires is that to the extent that they're going to have, you know, X amount of, you know, male athletes, right, and they have to have a, not corresponding exactly to the student population, but the point is they have to treat those programs relatively. Yeah, but I mean, come on. The way that cashes out is they have to have a bunch of non-revenue generating sports, correct? Well, first of all, not in the pleadings, and I can't say that for certain, but by their admission or by their claim, virtually all of their sports are not revenue generating, including the men's sports. So they don't have to have non-revenue, they may have to have a couple of non-revenue generating sports, but they have an entire system of sports for reasons that apparently go beyond revenue generation, and they don't, they can cut every single men's team except for football and basketball and comply with Title IX by keeping, you know, whatever they believe to be the most profitable women's teams. It's not, it strains credibility, and again, it's irrelevant on the motion to dismiss, but it strains credibility for them to say that, you know, this whole thing is going to doom college sports. But again, in any event, they can just relax the restrictions. That's as simple as that. I know you don't like the word amateurism, but do you agree that, or do you think there is such a thing as amateurism? Does it exist? I'd be hard pressed to define it. I think it exists. I think it's a useful word to use in the antitrust context to some degree, because, and that's why I think this is even a simpler case than those antitrust cases, because there's a real tension in the antitrust circumstances between what the antitrust laws would ordinarily require an organization or institution to do and what the NCAA claims will be problematic for it if it can't. How about in the sports context? Is there such a thing as amateurism? In Division I? Not with a single definition. I mean, there's just not. The NCAA will tell you, as it has, that amateurs are amateurs, I guess, by virtue of the fact that they don't get paid. What about the non-scholarship kids who just want to keep playing for another four years? Are they amateurs or something other than amateurs? They're employees. I mean, I think the complaint in this case pleads, given the degree of control that the institutions exert over those individuals, it's not like they're not playing club sports. No, but they might say, I'm willing to subject myself to that control. I just want to be on the team. I want to keep playing this sport that I love. Yeah, but that's what the people in Tony Alamo said. In Walling, the Supreme Court said people who work for someone, who work somewhere for their own advantage without any compensation agreement are not employees. So what do we call those people? The people, the Walling people? Yeah. Well, again, I think you can take, and I don't have the Walling case in front of me, but I trust that that's a line that the court said. Yeah. But if you read all these cases in context between Walling and Tennessee Cole and Tony Alamo and Williams, the Williams-Fricken case, none of those cases stand for the proposition that if someone just says that they're doing it for their own benefit and that they're not interested in receiving compensation, that is not sufficient to automatically render someone not covered by the FLSA. And so what you have to do in those cases, as the courts did, and in this case, as we'll have to do, and again, we didn't plead that someone is out there saying that, right? That would be an inference that would be drawn sharply against us, which is not permissible at the pleading stage. But that would be something that we'd have to, after discovery, apply the factors, whether it's the Glatt test, whether it's a different test, whether it's a holistic approach, look at it. But what it's not going to be is a simple dismissal of the case because the NCAA doesn't like the way that people are usually analyzed as employees. The difficulty I had with the complaint was that, other than identifying the named plaintiffs and where they go to school or play the sport, it really doesn't make any factual assertions about their experience and the control that they experienced. It sort of talks in broad terms about this is the way it works in the Division I world. Why didn't you talk about the control and the compensation bargain or expectation and all of these things with respect to each of these five or six plaintiffs? Well, I think it's a fair inference to be drawn from the complaint that, given that they're students, we described them as student-athletes in Division I programs, and then we described all of the restrictions that are placed on student-athletes in Division I programs. I think it's a fair inference. If it was an artful pleading, then that's something that we could address. But it's a fair inference, I think, to say that those are the restrictions that they were operating under. And you know what? Frankly, whether they loved them, whether they didn't like them, it's neither here nor there, frankly, because at the end of the day, the issue is the degree of control and the other factors that are considered in determining whether or not these individuals are employees and not whether they happen to like the fact that they couldn't go to biology or what have you. I did have a couple of things. One, you're talking about the historical evolution of this, and one of the articles referenced in your brief, I think it was your brief, that referred to Hugh McElhaney, who, you know, it wasn't that long ago, it wasn't 1930, because I remember when he was playing football for the Giants, and he's reported in that article to have said that when he was drafted by the New York Giants, he wasn't sure he could afford to leave college. He was making so much money playing college, the Giants were not going to pay him which kind of money he was making in college, because he got an X amount of dollars every time he scored a trip zone, in terms of the evolution of this. So it does seem like it's a relatively recent thing. Dawson, I just wanted to read from Dawson, because it seems to me this has dropped out of the discussion totally. But the court, the other side of Dawson said, Dawson does not allege that he was an employee of USC, so the pure question of employment is not before us, and we need not consider whether he had employment status as a football player, nor whether USC was an employer. The only issue before us is whether the NCAA and the Pac-12 were his employers under federal and state law. And here you've alleged a joint employer relationship between the NCAA and the university. So Dawson, even though it's before Lawson won, but also it just strikes me as not relevant because of limited inquiry in Dawson. And the other thing, in terms of Walling, do you remember who the primary beneficiary was in Walling, in terms of the railroad? Yeah, and that's the point in that case, the primary beneficiary, which is where these tests get derived from, was the worker who was not an employee. In fact, it was a detriment to the railroad to have this worker. Yeah, they received nothing, it was a detriment. Yeah, it was actually a problem for the employer to have this individual go through this training program. One last thing, in terms of the definitive Department of Labor, one, it's an affirmative defense, so that's not something that we can consider here, anything on the 12B6 appeal. But what would be your response to Mr. Katz's argument in terms of the Department of Labor and the purported reliance the universities have made on the Department of Labor guidelines? Yeah, I would point to the district court's decision in the case, which nailed it, which is that it would undo, it would effectively undo any limitation to the exception if you could point to, well, now I've gotten sued, so I'm going to put in a brief that says I'm relying on this. And that was an argument that was rejected in the Livers case, and in the Livers case, the case ended up going into discovery on the issue of that DOL regulation, and we plead this in our complaint. We sought, or the plaintiff's counsel in that case, sought all communications and documents referring or related to FOH 10B03E that also refer to or relate in any way to the classification of student athletes as school employees. The response was after a thorough and diligent search, no documents were found. If that doesn't undercut, from all the other reasons too, but if that doesn't undercut the present contention that there is reliance, relevant reliance, at the time these decisions were being made and remade and remade and remade, I don't know what does. And just to your point, Judge McKee, on that, I think it's really important to highlight that this is an affirmative defense because we don't have to plead around this, and we didn't plead that there was reliance. We played a whole bunch of paragraphs demonstrating that there wasn't in an effort to plead around something we didn't need to, but we did not plead that there was reliance on this, and multiple, multiple cases out of the Third Circuit have held that it's inappropriate for an affirmative defense to form the basis for dismissal on a 1236. And finally on that point, the DOL regulation does not say or mean what the defense is trying to say it means in this case. There are two parts to that regulation. One lists a bunch of activities, but the second sentence qualifies those activities as being conducted primarily for the benefit of the student, and we did not plead ourselves into that box in connection with our complaint. We plead ourselves, not intentionally, just because these are the truthful allegations. Our allegations plead us out of that box. There's no basis to dismiss based on the DOL's regulations. I guess we're not being asked to find that anyone is an employee, right? Just that I guess it could be after you do your discovery and everything. If a student athlete is deemed to be an employee under the FLSA, is the compensation that he or she would receive then as an employee, in your view, would that be in lieu of or in addition to the benefits that they currently receive under this scheme? It would be in addition. It's just the same as any other employment in the planet, right? I mean, I have, well, I shouldn't say any other employment, but there's various benefits that come with employment like 401K, sometimes 401K matches, the ability to participate in benefit plans that you'd otherwise have to pay more. It would necessarily be in addition, or could these universities say, I mean, I know it's hypothetical, but could they say, okay, we're going to pull all these scholarships, and then we get the scholarship, but you get minimum wage. Well, the school is not obligated to provide the scholarship. So a school could say, I suppose, and then this is what they're claiming could happen, but again, we're not there yet, but they're claiming that if they have to pay minimum wage, they might start pulling scholarships. But you can't say that a scholarship or any other particular type of benefit satisfies the requirement to pay minimum wage under the FLSA. Can you say that again? Sure. They cannot contend that, well, we pay this person a scholarship, so we don't have to pay the minimum wage, because when you look at the scholarship value over time, you can't do that. So, yes, again, all this could be avoided if they just don't make these people employees, but if they were insistent on sticking to their guns on the way that they treat these student athletes, and they had to pay the minimum wage, they could say, I suppose they could say whatever they want. Why not minimum wage? Yeah, I mean, they could, but I think that that's extremely unlikely given the amount of resources that get put into these programs. Why couldn't one say, we believe they already are employees, they already are getting a compensation bargain, and it's more than minimum wage? Because I don't believe that there's any case or jurisprudence that would permit you to rely, and this is what I meant to say before but didn't articulate it well, to rely on the fact that you're giving them one-time benefits to replace a minimum wage salary. So I think you would still, just like if I was working for a company that gave me health insurance that's 30% of the premium, that company can't pay me nothing because that premium is so expensive that it's worth more than the minimum wage. So you can't get yourself out of the minimum wage in that way. Well, maybe the market would take care of that and create an ugly situation. We may have an ugly situation anyhow, but I couldn't imagine that the left tackle or the quarterback on a national championship competitor would be outbid, the school would be outbid for the talent of those players. Somehow the market would take care of that, even if they tried to, they would think that the school would find the resources somehow to keep them there. Well, I think that the important point here is that we are not seeking market compensation. And I think that's important because I think it undoes a lot of the arguments that the NCAA is making with respect to the parade of horribles. There is no statutory right to market compensation. There is a statutory right to the minimum wage. So if we prevail in this case, whether it's $7.25, whether it's $10, depending on the state you're in, all employees will be paid that minimum wage. And so this does not open up a circumstance in which there becomes a bidding war. The NCAA is still legally permitted under all the antitrust rules, decisions that have been made, not to open up compensation to market-based compensation. The issue really isn't minimum wages, it's collective bargaining. Well, again, I hear, I understand that, that the NCAA could be concerned about that, but it has no place. You're concerned. I imagine that's from your side of the thing. That's your concern, too. No one really cares about minimum wage. They care about collective bargaining. Well, but if that were the case, I'd be bringing this claim under a different act, right? And in fact, I mean, this has nothing to do with this case and not appropriate to determine anything related to that on a motion to dismiss, but as an aside, the NCAA is already feeling the heat on that from the NLRA and NLRB who have issued numerous opinion letters of recent vintage finding that, or asserting anyway, that these student-athletes are employees. But whether the NCAAs, oh, by the way, for the reasons that we're articulating here, but whether the NCAA's construct on this all tumbles down, it doesn't mean that we have to keep it up if it's not legal. So, and the last thing I'll say is, I think, and I apologize, I'm over my time. I said one sentence? Yeah. Okay. Mr. Katz, I think, referenced, you know, that we should go to Congress, you know, to get minimum wage. Congress has already passed the minimum wage law, but if you read the decision in Alston, Judge Gorsuch said, the NCAA is free to argue that it should be exempt from the usual operation of antitrust law, but that appeal is properly directed to Congress. It is the NCAA who has been trying to and who it is on them if they want to have this unlawful scheme with respect to the failure to pay minimum wage, it's on them to get an exemption from the FOSA. That does not exist today, but it is not on this court or the district court or the Supreme Court or any court to create an exemption that doesn't exist in the law. Thank you. Your Honor, very briefly, a couple of points that were just touched on and then I'm completely at your disposal because I'm out of time. Judge Porter, you asked about what are scholarships to student athletes or employees? The answer is under the FOSA, they are compensation. Provision of benefits, in-kind benefits to employees are wages defined in the FOSA in the 20 annual statute. They're not tax-like wages, right? Well, let me come to that. Let me come to that because you raise a very interesting implication and you asked about what are the consequences of the ruling here. So step one, it's not hard to imagine what the consequences are to scholarship athletes who join the collective in this case if plaintiffs prevail. They get nothing. Why? Look at the attended schools. The cost of attendance in the attended schools are mostly in the $70,000 range. One of them is a bargain. It's in the mid-60s. The value for a full-ride scholarship, that entire amount would be wages. Minimum wage, if you take the ridiculous assumption that student athletes devote 2,000 hours a year to playing sports, essentially full-time employment, no time for classes, no time for anything else, just go home, shower, eat, go back and practice again or play, that claim is only about $14,000 and change. Even if a quarter scholarship, that minimum wage claim is about $3,600 for the year in comparison to one quarter of $60,000 to $70,000. So that wipes out their back wages. That would be a consequence. That is a consequence of taxes, and you're correct. The tuition portion of scholarships is not taxable. Unless, of course, that money is payment for services. That's the language of the IRC. So if student athletes are employees that receive scholarships, the scholarships are in-kind wages under the FLSA. They would necessarily be payment for services. They become taxable. Well, what are the back taxes of the tuition portion of that scholarship? Assuming student athletes... You know what the back... For a tax that wasn't doable for a certain point. You could really be taking us down a rabbit hole now. You can't be complicated enough without going down that rabbit hole. Fair enough. It's a potential implication. The other two points I want to do just very briefly is they're just going to be key. You asked about factors one and seven related to expectation of compensation and employment, and you said, are they more significant than the others? Well, the Second Circuit in a Wayne case called them crucial. Crucial means crucial. They're essential. In the free market context. Well, in the context, crucial meant they were the most important factors. Again, in a free market context. That's why I'm so troubled by GLAD. It doesn't work outside of the free market context. No courts have applied it in looking at student athletes. I just think that it wasn't well reasoned. Judge Thomas's... Not Justice Thomas, Sid Thomas of the Ninth Circuit, when he wrote Dawson, he was very clear on how he limited the issue there. He was. He absolutely was. And I just don't think it works outside of the free market context. By definition, it wouldn't work, because when you talk about expectation of compensation, you're talking about a situation where the normal free market forces would work. If they're not working, what value would the expectation of compensation have? Well, but it is still an important element of the economic reality analysis. I agree that you're right that GLAD doesn't work, and I think the explanation I provided and the one that you just articulated overlap in some very significant ways. I would agree with you. Okay, but then I'd say look at Alamo. Their expectation was not to be paid, and the court said, nevertheless, they're employees. Yes. Judge Porter, I wanted to come back. You had asked a question about whether student athletes were paid at the time the FOSA was passed, and the answer is no. For some 20 years, the NCAA, or it had another name at the very beginning in 1906, it existed. In fact, the rules were tighter then. Not only were student athletes not allowed to be paid, they didn't get scholarships at that point. What about Michael Levy? How did he get hundreds of thousands of dollars per test done in the 50s? Well, I believe the article you're talking about, and I don't know whether this story is true, but I believe the article was talking about some unnamed booster was putting money under his pillow. It was a paradigmatic example of the kind of thing that the NCAA has been fighting to eliminate from college athletics ever since the 1970s. Is it possible that these student athletes were not employees in 1938, but because of changing economic realities and changing facts, at some point, they could become employees? It's theoretically possible, but I think it's not realistically possible, given the continuity of case law up until the district court decision makes the case. That's the problem. The extent of control has changed drastically since the FLRA was first enacted, and the complaint lays it out. They lay it out in terms of comparing student athletes with the worst study students, who have many of the very same characteristics of a guy who's playing left tackled on a football team, but the worst study student has to get paid. The complaint certainly alleges that control has drastically changed. It doesn't say a lot regarding history, but it certainly makes that assertion. But under the governing test, the control by itself is not enough. And that is where they forget. I'm sorry. What governing test are you talking about? The economic reality test. The central element of which is the presence of a compensation bargain in some form, and I add that because of the Alamo case, because it can come in many forms. Let me ask you, I asked your friend, and that is why we're here, because if economic realities are fact-bound, if employee status under the FLSA is intensely a fact-bound question, I don't see what the pure legal question is that we can answer here that helps you all and helps the district court. Because, Your Honor, up until the district court decision in this case, and the one in Livers, although the Livers case basically went away when the plaintiffs just dropped it, up until then, the courts have consistently resolved this issue as a pleading motion, as did the 7th and Berger, that as a matter of law, student athletes are not solely by virtue of being students, employees of the FLSA. With this complaint and allegation of student plus, I'm a quarterback and I also work in the cafeteria, you know, I have some other job. That would be a different case, granted, conceivably. But the courts have always disclosed that as a matter of law, and that's the legal question we're asking you to either accept or reject, that as a matter of law, student athletes are not ipso facto employees under the FLSA. Because that's all that's being alleged here. The fact is that they are student athletes. Okay, so not ipso facto, but what would push them into the employee category? Particular facts. I, you know, well, certainly, although we have no allegations like this, something like, well, I was promised that I would be paid a salary. Would discovery help answer that question? No, because it's the allegation. There's no allegation of a compensation bargain. In fact, the complaint disavows any compensation bargain. It says we did not get paid. It now has prevented us from getting paid. It foresaw such an allegation. So if we answer that, the question you posed, are they employees ipso facto because they're student athletes? If we answer that no, that doesn't mean they can't be employees either. It doesn't mean they could not. They can't on this pleading. There's nothing on this pleading that would save this claim if this court says no, student athletes are not, as a matter of law, ipso facto employees under the FLSA. Nothing in this complaint. Could they file another complaint with a different set of allegations? Yes. Could they try to drastically amend this complaint? Perhaps. But that would be, as a practical matter, no different than filing a new complaint. It seems to me the whole point is we cannot answer that until there's been factual development. I don't know how we answer it in the abstract. In the same way the Seventh Circuit was able to. In the same way the district court in the Dawson case was able to. In the same way, presumably, the Ninth Circuit could have answered it, although we don't know because they didn't need to reach it because the schools were not present in the case, and therefore the issue wasn't resolved. And you're saying the way the Seventh Circuit did in Berger was no compensation expectation? Correct. I'm way over my time, so I'm entirely at your disposal, as if it were any different at any other time. Thank you very much. Thank you, Your Honor.